This matter comes to you on appeal from the District Court trial. The issue here is whether sufficient evidence was adduced at trial to support the verdict of the judgment against H.I.S.C. Can you speak up a little bit more loudly? It may just be me, but I'm having a little hard time hearing. Probably not you, but I'll get closer to the microphone. Is that better? A little bit. Okay, I'll try to speak up. So, at bottom is my concern, and should also be the court's concern, that to allow this verdict to stand would set a low precedent for what constitutes secondary meaning in the Ninth Circuit. The evidence of secondary meaning is extraordinarily thin, and we don't believe that the defendant carried that burden, cross-complained and carried that burden. We also noted in our briefs certain lack of evidence. The cross-complainant's case largely rested on the testimony of Ms. Raja Nayagam, who was the owner of Franmar and a defendant, cross-complainant, clearly biased. The testimony of Dr. English, who was not designated, not deemed an expert on secondary meaning, gave testimony, largely that was inadmissible, on the likelihood of confusion. As we pointed out, the likelihood of confusion analysis was flawed because it didn't really measure the confusion between the two products, the two marks or brands, if you will. We also pointed out issues with the jury instruction. We think the court erred in giving the manufacturer-distributor jury instruction that essentially directed the jury to one of two conclusions, that either the manufacturer or the distributor, in that case Franmar, could own a trademark of a good. Counsel, how is that true? The jury instruction said that it may be the manufacturer or the distributor. It didn't say, didn't preclude others from also holding the mark. Thank you for that question. My concern is that it didn't take into consideration that my client, who was a reseller, could hold the mark. It limited the analysis to one of two parties, one of which wasn't even in the courtroom. Ravi, the manufacturer, wasn't even there. If you read the comment to the model jury instruction, that jury instruction is intended to be used in a dispute between the distributor and its manufacturer over the mark or brand or use of trade dress. It's very clear from the comment that it's only to be used in the absence of an agreement between the two of them, between the distributor and manufacturer. Counsel, what was precisely wrong with the instruction? It seems to be just a simple proposition that a trade dress can be assigned, the ownership or use of this trade dress can be assigned, and you're not disputing that. No, no, no, no. The jury instruction itself is not, there's nothing wrong with the jury instruction. The mistake was applying it to the facts of this case because there's no evidence of an assignment. In fact, the evidence is contrary. The evidence is specifically contrary. In testimony, Ms. Rajanayagam testified in ER 484 of our designation. The question, now, who owned the design of the broom that you brought into the United States? Her answer was Ravi. And so, if that is the case, then the result, the evidence is diametrically opposed to the result. Well, didn't she testify that there was an oral agreement that Fran Maher would be able to distribute it into the United States? Yes, there was an oral agreement that Fran Maher could distribute. However, that testimony also, in that line of testimony, she also very specifically testified that Ravi owned all the intellectual property. So, the question is, how does she come to a conclusion, or how does a jury come to a conclusion if Ms. Rajanayagam testified that Ravi owned the intellectual property and the design, then how does that work that she owns the trade dress? And that's the problem, because that jury instruction then suggested to the jury that one of two conclusions can be reached. That she could own the trade dress, or Ravi could own the trade dress, but Ravi wasn't there. So, that's why it was confusing, and I think it misled the jury. Does HISC dispute the ownership element? Do they claim ownership over it? HISC put on evidence that if there was any identity of the trade dress, and let's be certain what we're talking about here. The only elements of trade dress are those four elements. It's not a broom. It's the weave, the cap, the fan, and the smooth handle. And if anything, the evidence was that Roxanne de Palma, through her appearances on QVC, and through the sales that dwarfed Fran Mar's sales, would have acquired identity with that property. I'm sorry, identity of that property. I mean, are you saying that they would have acquired ownership of the trade dress? That's exactly what I'm saying, because of her pervasive display on QVC on television, repeatedly, and the sales efforts. When you compare the facts as to the number of brooms that were sold, the sales, Fran Mar's sales in the United States were insignificant, dwarfed by HISC's sales. And so, it was clear from the evidence that the identity, if any, as to those four elements, would be with Ms. de Palma. And in fact, Mr. Inglis's report, or in terms of confusion, or I think it was Dr. Chorn's report, who was the only survey expert, it was the only survey evidence that was placed, was put into evidence, was that there was confusion. And the confusion, if there was any confusion, it was that the trade dress was associated with my client, not with Fran Mar. One last question on the instruction. I mean, under that theory, if your client is also claiming ownership, why doesn't the instruction go to your client's benefit as well, since they're a distributor, and couldn't they have argued that they're the distributor that owns the trade dress? No, that's a very good question, and that's the problem. My client is not a distributor. My client is a subseller to Fran Mar. Fran Mar took the position that it was the exclusive distributor. So it put itself squarely in the frame of that jury instruction. Yes, had my client been a distributor from Ravi, then we would have argued that HISC owned that trade dress. And I guess this whole discussion that we're having, and I appreciate it, suggests the confusion that the jury must have had over that jury instruction. We wanted a different jury instruction on that. In fact, we objected to that jury instruction, and pointed out to the court that it would lead the jury to one of two conclusions, that either Ravi or Fran Mar owned the trade dress, and Ravi wasn't there. And so it didn't allow for an argument that HISC would have owned that trade dress, because it wasn't a distributor. But the comments to the model jury instruction is that the jury instruction should be given in a dispute between the manufacturer and distributor. Is HISC a merchant? HISC is a reseller. It bought the goods. The evidence is that HISC bought the goods from Fran Mar. So it was a customer of Fran Mar. It was not a distributor. So counsel, would you tell me what specific instruction are you talking about? 15? Yes, your honor. Well, and are you now arguing that the court should have given 15.13, the elements of ownership? I mean, it seems like in your blue brief at pages 18, 42, and 53, you argue that 15.13 would have been the proper instruction. But didn't you object to that at the trial court? We objected to that instruction. We objected to the instruction 15 as it relates to that specific instruction. We were looking for an instruction. No, actually, I think we just rejected that entirely. But we did want an instruction on ownership, because there's a lot of evidence that came in on who owned the design. And the reason it was relevant is because I believe in jury instruction 13, 12 are looking for the jury instruction. Ownership was that in order to prevail, Fran Mar had to prove that it owned the trade dress. And that's why we felt that an instruction on ownership was necessary. What we got was an instruction on ownership from the model instructions that didn't fit this case. And that was our dispute. And I can't put my hand on the jury instruction. And I'll reserve a minute or two and come back and provide it to you once I can look at the document. Counsel, can I just ask one question on the secondary meaning question? Most of the cases you cite in your brief seem to have dealt with PIs or motions dismissed. Is there any case that you could tell us of overturning a jury verdict on secondary instruction? I'm sorry, secondary meaning? No, I don't have one at the ready. But these things are decided on the law in summary judgment oftentimes, and probably should have been decided in summary judgment. So the same law that would apply in a summary judgment setting would apply here. Because the standard is essentially, actually, the standard is higher in a summary judgment. And the burden is higher in a summary judgment. And the same law… Well, but we give deference to the jury verdict. So it would be different in that respect. Well, to some extent, you're correct. There would be deference to a jury verdict. But there still needs to be substantial evidence to establish that Franmar owned the trade dress, and the evidence is contrary, that the trade dress, the secondary meaning, as to those four elements. And let's not lose sight of the fact that Franmar wants to fuzz the corners here. We're not talking about a broom. We're talking about those four elements, that those four elements are associated with it as having that secondary meaning. They didn't get there. They didn't get there. The ornate weave, the cap, the smooth handle, the fan. That's not it. No evidence exists to identify those elements with Franmar. Franmar relies on the confusion argument, the risk of confusion. Well, Dr. Inglis' testimony was indivisible on that topic. Dr. Inglis did not come to a conclusion of secondary meaning. He couldn't. He wasn't designated. He didn't testify. Wasn't there some testimony from people who said they were confused? And again, we are reviewing a jury verdict. And there was some evidence out there. And shouldn't we credit that to the jury? Well, if it's creditable, you have to look at Jennifer Grist's testimony. There was one witness, one. That's all that came forward and said, hey, I thought I bought that broom. But her testimony also provided that the broom broke. Roxanne DePalma, DePalma Industries, HISC, DePalma Enterprises, logo and phone number were on the broom that broke. But I called Franmar because I found them on the Internet. That's not confusion. That testimony does not tend to show that there was confusion between the product that Franmar sold and the product that HISC sold. That's all it is. And when I asked her specifically, point blank, what is it about the broom that leads you to think it's Franmar's broom? She couldn't articulate any of the four elements. Just that she found Franmar on the Internet. So I don't know how you come to that conclusion. And I think the jury instructions led the jury to a conclusion that they should not have reached. All right, Counselor, I think you're out of time. We'll give you still two minutes for rebuttal. Thank you. Ms. Daschner. Thank you, Your Honor. Appellants have not met their burden of showing that there was no substantial evidence to support the jury verdict. Critically, appellants have chosen to ignore evidence that was admitted at trial that was unfavorable to them. The appellate court reviews all of the evidence and should consider any material omitted evidence as sufficient to support the jury verdict. Currently, appellants are arguing, while we're at risk of setting a low precedent, that there was a very thin amount of evidence to support secondary meaning. But they've ignored three key areas that support three of the factors, or seven factors, for finding secondary meaning. And they completely ignored, in their opening brief, these three areas. First, on exclusivity of use, there is this admission. The appellants admitted that they had this three-year relationship with Framar, where they exclusively used the original garden broom from Framar. This was a unique product. They had never seen it before. And they saw it based on a blog article featuring the original garden broom. This was admitted into evidence, where it showed an image zoomed in on the hand-weaving and coconut shell cap, trade dress features of the original garden broom. Based on this publicity, so we know it's effective because it reaches appellants themselves, they reach out to Framar and they want to resell the broom. And they agree to Framar's terms. Ms. Rajanayagam asks them to use the name original garden broom, and they comply. There's restrictions on marketing channels, and they comply. And Ms. Rajanayagam also honors this agreement with appellants, where she says, yes, you are the only reseller, so I won't let Alice Strong also resell the original garden broom during this time. So it is an agreement between the parties, where Framar exclusively gives the product to appellants. Why would appellants have agreed to these terms unless they recognized it was Framar's product and recognized it had marketing value? The second factor they completely ignore was this intentional copying was derived from a long-term working relationship between the parties, where appellants then desired a seamless transition from reselling the original garden broom to then becoming distributors of their own relabeled product, the ultimate garden broom, where they made no effort to distinguish on PVC that they were now selling a different product. They could go on advertising it in the exact same fashion. And even though, in this trade dress context, we don't have to show a willful intent, a willful intent did come through, and we have that through appellants' own testimony, where Roxanne de Palma admitted that, yes, she sent this email. This was Exhibit 319, Energy Step Trial, to Sam Mahilan, where she goes, buy out all of the brooms so that Ravi, the manufacturer, cannot provide them to Framar anymore. She wanted to put Framar out of business. They had this intimate relationship with Framar where they learned, and this was admitted to by both Roxanne and Bob de Palma, they learned shipping, customs, tariff information, all from Ms. Rajanayagam. So they get all this information from her during this relationship, and then they want to put her out of business once they copy her design. And Ms. Rajanayagam testified as well that she became aware of their intent to copy her product, her trade dress design of the original garden broom, because her contacts at Ravi reached out to her and said, Sam Mahilan has been going around to Ravi and has been buying out your intelligence on how to make the original garden broom. So even though we don't have to show a willful intent, as set forth recently in the U.S. Supreme Court of Romog v. Fossil Group, we don't have to show willfulness, but there was willfulness to intentionally copy the non-functional features of the original garden broom. And third... Counsel, before you go on to the third point, so is HISC, are they a distributor of the ultimate garden broom? They were... So that the jury instruction on ownership would apply to them as well? They could have argued that they were either the manufacturer or distributor in that jury instruction? Yes, Your Honor, they could have argued that, but the evidence at trial would not have supported that argument. The evidence at trial was that Ramar owned the trade dress. They were an exclusive distributor for Ravi, but counsel only points to select portions of Ms. Rajanayagam's testimony. She also went on to testify that she had an agreement with Ravi where she owned the trade dress, and this was also confirmed by Sam Ahimon when he tried to go to Ravi and they would not sell to him because they honored their agreement with Ramar. But certainly, yes, to your point, appellants could have argued that they owned the trade dress, but the evidence wouldn't have supported that. We would have been able to argue in the contrary that there was this relationship between the parties where appellants were reselling, they agreed to Ramar's terms. So when appellants referred to the successful sales they had on QVC, that was while there was this agreement with Ramar to sell the product. So this is a new argument. This was never raised before, but appellants are now for the first time arguing, well, we could have owned the trade dress, and this instruction concluded that finding. But that's a new argument. It was never raised at trial. So the significance of that is we've never had a chance to really address that argument of whether appellants owned it because they did not argue that at trial. And if you'd like me to… But you would argue, counsel, that trade instruction 15 then is neutral as between the two parties. It could have applied to either party. Yes, Your Honor. It very well could have. Appellants certainly had the opportunity to argue that they were the owners at trial. My third point of what was completely missed by appellants in their opening brief was they completely ignored Dr. Inglis' study where he found a quarter of his 600 participants, which is statistically significant, found a likelihood of confusion where they believed the ultimate garden broom came from the same source of the original garden broom. Without giving us any chance to respond to their arguments, appellants now come up with this, well, his confusion study was flawed. But Dr. Inglis was never challenged at trial, and there was never any rebuttal saying that his study methodology was improper or incorrect in some respect. He was… But was Dr. Inglis designated as an expert on this topic? He was designated as an expert on likelihood of confusion, which is actual confusion, which is one of the seven factors of secondary meaning. And so his testimony at trial supported one of seven factors for secondary meaning. Same with appellant's expert, Dr. Torn. She only addressed, and she conceded this, she only addressed consumer perception, which is only one of seven factors for finding secondary meaning. And none of these factors are given priority over any of the other factors. So even though we don't concede that Dr. Torn's study was conclusive on consumer perception, but the case law is very clear that the absence of one or more of these seven factors is not going to preclude a finding of secondary meaning. Further, Dr. Inglis, they're saying now, well, his testimony was inadmissible. The objection that counsel referred to in the reply brief was a sustained objection to a compound question. So there was no chance that his testimony finding actual confusion was somehow inadmissible. And so that factor of actual confusion is one of the factors for secondary meaning, one of the cornerstones of our case. So it's very significant that appellants just chose to completely ignore it in their opening brief. Returning to these new points that were raised regarding the ownership instructions, Judge Malloy was correct. And it was Model Rule 15.13, which we sought to introduce. Appellants objected to it, and they didn't propose any alternative instruction on ownership. So they're claiming now that they wanted some other instruction, but if you look at the record, it's unclear what instruction they were hoping to have when they objected to 15.13 and then didn't propose any alternative instruction. It's further, it's incorrect for appellants to state that the instruction only applies to a situation when there's a dispute between a manufacturer and distributor. The comments propose how you could apply the instruction, but the comments are not read to the jury. So any presumptions that were raised in the comments were not given to the jury, and there's no evidence that the jury was somehow confused or misled by this instruction. As I said earlier, the ownership in Framar was very clearly established by Ms. Rajanagam's testimony, appellants lied to some other testimony, but again, the jury was tasked with weighing the evidence and making these credibility determinations. So it's not really the standard on appeal to say what portions are to be leaved when everything is supposed to be looked at as a whole. On secondary meaning, that is a correct statement. There are no cases that were cited by appellants, and certainly none that I found, that overturned a jury verdict finding secondary meaning. The case of First Brands was one of the notable cases cited by appellants, but that was a preliminary injunction, so it is a different standard. Appellants also make this point about Mrs. Grist's testimony, where appellant says that they asked for a point blank and she couldn't identify any of the trade dress features. That's simply not true. She testified that she had been going to the trade shows for 10 years, and she was drawn to the original garden room based on its design, and she identified specifically the weave and the coconut, she called it the cap on top, but that's a coconut shell cap, and those are two of the trade dress features. Also, when appellants later, when they were cross-examining her, they asked her, well, why didn't this sticker with our name and contact information help you? And her testimony on this is very telling because she says, the image stuck in my head of the original garden room. So she identified the original garden room as a source of this product, and the case law is also clear on this, that labels alone do not absolve the infringer. And clearly, as Mrs. Grist testified, it did not help her. Putting this sticker on there did nothing to avoid her confusion when she purchased this product. There was also other testimony of actual confusion. Appellants are critical of Ms. Rajanayagam's testimony, but again, that was a credibility determination. It's the jury that's tasked with whether to believe she was biased or not. Her testimony was that she fielded 60 to 75 telephone calls from customers. They called her because they believed they had an original garden room and they had problems with it, but as Ms. Rajanayagam talked with them, it came out that they actually had the ultimate garden room and they did not have her product. So that's the clear evidence of actual confusion. And Ms. Strong, who later resold the original garden room after the relationship between the parties ended, testified that at the 2016 Philadelphia Flower Show, she first-hand witnessed customers at the show who had inadvertently purchased the garden room and then they accidentally bought this ultimate garden room because they look exactly the same. The testimony on intentional copying that I didn't yet touch on was very clear from Sam Ahilan as well. He testified he was shown either the actual original garden room or an ultimate garden room by Bob DePalma, and based on that, he went to Sri Lanka to try and acquire the same looking room. He had a couple of different manufacturers in Sri Lanka that were going to help him with this. One of them, an individual named Vajitha, told him, well, I can make some changes so it doesn't look like this original garden room so that you're not infringing. Several different samples were given to Sam Ahilan. He shared these with appellants. It was shared that there were these alternative ways to make the product, but appellants did not want these alternate ways. They did not want to make changes. They wanted it to look exactly like the original garden room. That inference is also supported by Bob DePalma's testimony. This was Exhibit 324, Bob DePalma's email, where he sends his specifications on how to make the broom. The trade dress features specifically referred to in this email are to make the eagle, the wide fan shape, the coconut shell cap. It says jute braid, but that's referring to the ornate weave, the material they call a jute braid. Bob DePalma is showing them these specifications. We have testimony that there were some problems with the villagers where they were unable to get the same amount of eagles so that it would look the same. That completely contradicts appellant's testimony that this was a widely available broom, that they just went and found someone else making it. It was not. They had to share their specifications, and then there were issues with getting it to look the same because it was not already a widely made or available product. Then again, we have the testimony from Roxanne DePalma, where she wanted to put Framart out of business by buying out all of the brooms. Their intent to copy was very clear through that. The actual confusion I touched on in exclusivity of use. The other four factors on consumer perception, Dr. Torn admitted that that was all she looked at, and she was rebutted by Ms. Raja Nayagam, who was identified as an expert who said, you know, there were consumers that did associate the original garden broom with me. In summary, appellants simply have not met their burden of showing that there was no substantial evidence to support the jury verdict, nor that there was any error in the jury instructions so as to support a motion. And I appreciate your efforts and your time. With respect to the ownership instruction 15.1, HIC did not offer another jury instruction. We opposed the jury instruction that was being offered. We thought that the other jury instructions on ownership were fine. What is confusing is that Ms. Daschner keeps jumping back and forth and never gave you a clear answer as to whether or not HIC was a distributor. In fact, HIC was not a distributor. The facts are that HIC was a customer of Raja Nayagam, and Raja Nayagam testified clearly that she was the only exclusive distributor. By de facto, that would exclude HIC from possibly being a distributor and would put HIC out of the purview of that jury instruction. In the opening brief on page 25, HIC points out that the trade dress could have been and should have been identified with HIC. And we cited to record ER 357 and 359. And it supports a conclusion that HIC could have been, could have owned that trade dress, but jury instruction 15.1 eliminated that prospect. That is error. And it essentially prohibited the jury from considering HIC as the owner. So did HIC argue that they were the owner before the jury? And just really briefly, because I know I don't have much time, the testimony from Ms. Gris was misrepresented by Ms. Daschner. I refer you to our reply brief. The testimony from Ms. Raja Nayagam as to the likelihood of confusion that 60 to 80 calls were received over a period of three years, there was no emails, no phone calls, no record, purely unsubstantiated, all hearsay. The only person that stepped up to say I was confused was Ms. Gris. And finally, with respect to Mr. Inglis, Mr. Inglis' testimony was not, the objection was, and it's on, it's in FER 151, on page, FER 151 line 9. Mr. Hendrick objected to Inglis' analysis of the 22% or 25% statistically reliable of confusion was a legal opinion. That was the objection. That was sustained by the court. That evidence that Ms. Daschner is relying on and that she relies on in her brief is not in evidence. So, there's no evidence. They have no evidence from Mr. Inglis that there was a likelihood of confusion, and a likelihood of confusion doesn't equate to actual confusion. Thank you. Thank you. Case has been submitted.
judges: Lee, Bumatay, Molloy